**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARIA ENCINAS, individually and as
representative for the Estates of Luis Nava,
Daniel Nava, Carlos Nava, George Nava,
Esperanza Nava, and Judith Nava, et al.,

*Plaintiffs*,

v.

ISLAMIC REPUBLIC OF IRAN, et al.,

*Defendants*.

Civil Action No. 1:18-cv-02568 (CJN)

**<u>MEMORANDUM OPINION</u>**

In the early morning of October 23, 1983, a suicide bomber attacked the United States
Marines Corps barracks in Beirut, Lebanon.  The blast killed 241 servicemembers and wounded
many more.  To this day, it remains one of the deadliest attacks against American citizens.

Plaintiffs in this action are servicemembers who were wounded in the attack, as well as
families and estates of servicemembers who were killed or wounded.  Claiming that the Islamic
Republic of Iran and the Iranian Ministry of Information and Security were responsible for their
injuries, they sued the foreign state and its agency under the state-sponsored-terrorism exception
of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.*  Having served
Defendants by delivery under diplomatic notes, 28 U.S.C. § 1608(a)(4), and Defendants having
subsequently failed to appear, 28 U.S.C. § 1608(d), Plaintiffs now move for default judgment as
to liability.  *See* Pls.' Mot. for Def. Judg. as to Liability ("Mot."), ECF No. 14.  The Court grants
that motion in part and denies it in part.

## I.       Procedural History

"There is a lengthy history of litigation before this Court concerning the 1983 bombing of the U.S. Marine barracks in Beirut." *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 114 (D.D.C. 2012); *see also id.* n.1 (collecting citations).  The flagship case is *Peterson v. Islamic Republic of Iran*, in which family members of deceased servicemembers, in addition to servicemembers themselves, sued Iran and MOIS under the prior version of the state-sponsored-terrorism exception.  264 F. Supp. 2d. 46, 48 (D.D.C. 2003).  The *Peterson* court conducted a two-day bench trial, "during which it heard testimony from lay and expert witnesses and received documentary evidence concerning the horrific attack, the grave injuries many suffered, defendants' involvement in the bombing, and their support for international terrorism more broadly."  *Fain*, 856 F. Supp. 2d at 114 (citing *Peterson*, 264 F. Supp. 2d at 48–59).  The court concluded "that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government."  *Peterson*, 264 F. Supp. 2d at 58.  And it found "that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran."  *Id.*  "The Court then determined, as a legal matter, that 'MOIS actively participated in the attack' and was 'acting as an agent of . . . Iran' when doing so, and thus defendants Iran and MOIS were 'jointly and severally liable to the plaintiffs' for damages."  *Fain*, 856 F. Supp. 2d at 114 (quoting *Peterson*, 264 F. Supp. 2d at 61).  It left damages calculations for later, passing the matter first to a special master to make further findings of fact. *See id.*

This case followed many years later.  All Plaintiffs are or were members of the United States Marine Corps, their heirs at law or legatees, or their immediate family members.  Amended Compl. ("Compl."), ECF No. 5 at ¶ 7.  Each Marine is alleged to have suffered either physical or emotion injuries because of the Beirut bombing.  *Id.* at ¶¶ 7, 31–58.

2

Plaintiffs served both Defendants through the Department of State's diplomatic channels, as required by 28 U.S.C. § 1608(a)(4). ECF No. 11. (A previous attempt to effect service under 28 U.S.C. § 1608(a)(3) was unsuccessful. *See* ECF No. 6, 7, 8.) The diplomatic notes were served on September 4, 2019. ECF No. 11. Defendants thus had until November 3, 2019 to respond to the Complaint. 28 U.S.C. § 1608(d). They did not.

Following Defendants' failure to appear, let alone respond, the Clerk of the Court entered default on Plaintiffs' behalf. *See* Clerk's Entry of Default, ECF No. 16. Plaintiffs then moved this Court to take judicial notice of the findings of fact previously entered in *Peterson* and *Fain*, and to enter default judgment. *See generally* Mot.; 28 U.S.C. § 1608(e).

In approaching this Motion, the Court is particularly guided by the decisions in *Peterson* and *Fain*. Those cases provide the foundation from which this Court builds.

## II.    Findings of Fact

FSIA does not allow this Court to enter a default judgment ministerially. Rather, the Court must first evaluate the evidence to ensure that Plaintiffs have established their claim "by evidence that is satisfactory to the court." 28 U.S.C. § 1608(e). "This requirement 'imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default.'" *Fain*, 856 F. Supp. 2d at 115 (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)).

The Court may look to many sources of evidence to satisfy this obligation. Testimony, documents, and affidavits can all be considered. *Id.* (collecting citations). And a FSIA court may "take judicial notice of related proceedings and records in cases before the same court." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51, 54 (D.D.C. 2009) (taking judicial notice of cases

brought in this District, though not before the authoring judge)).  In this case, Plaintiffs rely on a combination of judicial notice and affidavits to support their Motion.  Mot. at 2–3.

### A.      Judicial notice of prior related cases

This Court may take judicial notice of facts "not subject to reasonable dispute" if they are "generally known within the [Court's] territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "This rule permits courts to take judicial notice of court records in related proceedings." *Fain*, 856 F. Supp. 2d at 115 (collecting citations).  "Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings." *Id.* (collecting citations).

As has been noted by other judges in this District, evidentiary problems lurk when taking judicial notice of another court's factual findings in a different case.  *See, e.g.*, *id.*  Such findings are a court's attempt to determine what happened; they are not a first-hand account of the actual events.  "As such, they constitute hearsay, and thus are considered inadmissible." *Id.* at 116.

But as Judge Lamberth has explained, courts in FSIA matters also "must be mindful that the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus*, 750 F. Supp. 2d at 172.  After surveying approaches to the issue, Judge Lamberth concluded that "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely on the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.*  "This is permissible because the validity of judicial records is generally 'not subject to reasonable dispute,' and such records are perfectly capable of establishing the type and substance of evidence that was presented to earlier courts." *Id.*  The Court agrees with this

approach and will therefore make its findings of fact by relying on the evidence presented in earlier, similar cases.

<b>B.      Findings of fact</b>

**1.      Iran is a foreign state and MOIS is its secret police.**

As the *Fain* court noted, "Defendant Iran 'is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984.'" *Fain*, 856 F. Supp. 2d at 116 (quoting *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006)).  Defendant MOIS is Iran's secret police.  *Id.*  Many courts reviewing similar evidence have reached similar findings.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 65.

**2.      Defendants helped set up and fund Hezbollah, a terrorist organization operating in Lebanon.**

During the *Peterson* trial, the Court heard testimony from Dr. Patrick Clawson, "a widely renowned expert on Iranian affairs."  *Peterson*, 264 F. Supp. 2d at 51.  He provided extensive testimony as to the intimate relationship between Hezbollah and Iran in 1983:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time, Hezbollah is largely under Iranian orders.  It's almost entirely acting at the—under the order of the Iranians and being financed almost entirely by the Iranians.  It comes to be an organization with Lebanese roots and Lebanese activities and more independence from Iran, but that's years past this time frame.

*Id.*  When the *Peterson* court later asked for confirmation that, "[i]n the '83 time frame, [Hezbollah] was essentially a tool of Iran," Dr. Clawson confirmed that it was: "Correct, sir. Indeed, both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began.  Hezbollah leaders today will sometimes describe that as the roots of their party and say that it has evolved away from being that."  *Id.*; *see also id.*

5

n.8 ("Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that 'Iran invented, created, funded, trained, and runs to this day Hezbollah.' ").

The *Peterson* court also heard testimony from Dr. Reuven Paz, who had researched Islamic terrorist groups for a quarter century. *Id.* at 52. He independently reached the same conclusions as Dr. Clawson about the connections between Iran and Hezbollah:

> Well, I would say that [Hezbollah], at [the time of the Marine-barrack bombing], totally relied upon, the Iranian support. We are talking about composing a new group, of Hezbollah, out of people who had very little military experience. They were members, before '82, in groups that actually did not deal with military issues or terrorism. And most of the members during this process of unification that created Hezbollah started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located.

*Id.* This testimony tracked the conclusions of Robert Baer, a case officer in the Directorate of Operations of the CIA from 1976 until 1997, who also testified at the *Peterson* trial that "Hezbollah wasn't 'formally' created until 1985. What happened was before it was a bunch of agents of Iran. But none of these agents, based on our intelligence, which was . . . outstanding, were operating on their own." *Id.* at 52 n.10. Baer gave a graphic example detailing this close tie to Iran: "One time there was a case where a Hezbollah member went out and kidnapped some children. But that was done independently, and the moment he was caught, he was executed by Hezbollah because he wasn't operating with authority from Iran." *Id.*

From this evidence, the Court concludes that Hezbollah, at the time of the Marine barracks bombing, was significantly intertwined with Iran. It took orders from Iranian commanders and had no independent force outside the scope of that relationship.

### 3. Hezbollah carried out the attack on the Marine barracks in Beirut.

The evidence also establishes that Hezbollah carried out the attack on the Marine barracks. In particular, Hezbollah disguised a 19-ton truck to resemble a water-delivery truck that routinely serviced the Marines at their Beirut International Airport headquarters. *Id.* at 56. The terrorists filled this truck with explosives and on October 23, 1983, ambushed the real water-delivery truck. The fake truck then set off to the barracks, driven by Ismalal Ascari, an Iranian. *Id.* It crashed through a concertina wire barrier and a wall of sandbags before entering the barracks. *Id.* When it reached the center, it detonated. *Id.*

All told, witnesses testified that the explosion was, at the time, "the largest nonnuclear explosion that had ever been detonated on the face of the Earth," with an estimated force that "was equal to between 15,000 to 21,000 pounds of TNT." *Id.* The attack killed 241 servicemembers. *Id.* at 58. "Steve Russell, the sergeant of the guard at the time of the explosion, testified that he had observed several victims of the bombings who were in severe pain before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims, and that many of the victims of the explosion endured extreme pain and suffering." *Id.*

Substantial evidence links Hezbollah to the attack. The *Peterson* court considered a videotaped deposition of a Hezbollah member, operating under the pseudonym of "Mahmoud."[1] *Id.* at 54. Mahmoud testified that the Iranian ambassador contacted a man named Kanani, who was the leader of the Lebanese headquarters of the Iranian National Guard. *Id.* at 54–55. The ambassador told Kanani to go forward with attacks that had been planned against the 24th MAU and French paratroopers. *Id.* at 55. Mahmoud also testified that there was a later meeting held in

---

[1] Mahmoud's testimony was verified by an agent who had worked for the United States in an intelligence capacity for thirty years. *Id.* at 54 n.15.

Baalbek, Lebanon, which was attended by Kanani, Sheik Sobhi Tufaili, Sheik Abbas Musawi, and

Sheik Hassan Nasrallah.  *Id.*[2]

Mahmoud testified that, during this meeting, Kanani and Hezbollah members formed the

plan to attack the American and French troops in Lebanon:

> They got the order.  They met and adopted the operation against the Marines and the French barracks in the same time.  The Marines operation was done.  They moved—they moved with one Iranian and one Shiite from the—Southern Lebanon over the mountain road to Hartareq Biralabin [phonetic spelling].  They stayed two days there.
>
> The—the cars were built, equipped, in Biralabin in a warehouse near a—gas station . . . underground.  They built the cars.  They equipped the cars there.  That's their center.
>
> One Dodge, one red Dodge, that was painted exactly like the other—the real Dodge that was providing water and other stuff to the Marines, and they moved it to the airport road where they put the hold on—ambush and hold the real car when she arrived.  They stopped the real car and they moved with the fake one that was built with explosives toward the Marine barrack.

*Id.* at 56.

### 4. Defendants aided Hezbollah in carrying out the attack on the Marine barracks in Beirut.

Mahmoud's testimony was supported by American intelligence that tied Hezbollah's

actions to Iran.  "On October 25, 1983, the chief of naval intelligence notified Admiral Lyons [the

Deputy Chief of Naval Operations for Plans, Policy, and Operations from 1983 through 1985] of

an intercept of a message between Tehran and Damascus that had been made on or about

September 26, 1983."  *Id.* at 54.  The message was from MOIS to the Iranian ambassador in Syria.

*Id.*  It directed the Iranian ambassador to contact Hussein Musawi, the leader of a terrorist group

---

[2] At the time of the *Peterson* trial, "Nasrallah [was] the present leader of Hezbollah."  *Peterson*, 264 F. Supp. 2d at 55 & n.17 (collecting citations).  "Musawi, Nasrallah's immediate predecessor as the leader of Hezbollah, was killed in a February 16, 1992 Israeli attack.  Tufaili is a former secretary general of Hezbollah."  *Id.* & nn.18–19 (collecting citations).

known as Islamic Amal, and to instruct him to have his group "to take a spectacular action against the United States Marines." *Id.* Admiral Lyons testified to the *Peterson* court that he had no doubt as to the message's authenticity or reliability: it was a "24-karat gold document." *Id.*

This is consistent with Dr. Paz's expert testimony. The *Peterson* court asked Dr. Paz for two expert opinions. First, it asked whether the Marine-barracks attack was carried out by Hezbollah in response to an Iranian order. Dr. Paz said yes: "Yes, especially at that time—even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel." *Id.* at 52. Second, the court asked whether Hezbollah could have carried out the attack on the Marine barracks "in the absence of Iranian scientific, financial, and material support." *Id.* Dr. Paz said they could not: "No, I don't think they could have carried out such an attack without Iranian training, without Iranian—Iranian supply of the explosives even, and without the directions from the Iranian forces in Lebanon itself." *Id.*

"The *Peterson* Court also received substantial testimony concerning the explosion and its aftermath," *Fain*, 856 F. Supp. 2d at 117, which provided further evidence of Iran's link to the attacks. Danny A. Defenbaugh provided forensic explosive investigations at the scene of the explosion. *Peterson*, 264 F. Supp. 2d at 56. He testified to the *Peterson* court about his findings:

> [W]e were able to, through the forensic residue analysis, identify the explosive material, and it was unconsumed particles of PETN . . . .
>
> PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white powder . . . that is then extruded inside of that cord . . . .
>
> In this case, it was not [consumed]; we found unconsumed particles of PETN. That was just like we had found also in the American Embassy

> bombing.  What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer.

*Id.* at 56–57.  Defenbaugh went on to explain that, when the commercially manufactured form of PETN is detonated, it is entirely consumed in the ensuing explosion.  *Id.* at 57.  Thus, the presence of *un*consumed particles at the Marine barracks indicated that the PETN used in the bomb had not been the standard commercially available form of the explosive.  *Id.*  It had been the raw "bulk form" of PETN, which is not sold commercially.  *Id.*  "In 1983, bulk form PETN was not manufactured in the nation of Lebanon.  However, at that time, bulk form PETN was manufactured within the borders of Iran."  *Id.*

A forty-year expert in explosives with the Army and ATF, Warren Parker, provided the *Peterson* court with further expert analysis.  *Id.*  He concluded that this bombing could not have been successfully carried out by a group of individuals with limited education and possessing no specialized training in explosives.  *Id.*  He based this expert conclusion on many factors:

> The degree of planning, the degree of sophistication in this bombing . . . . The fact that it was a significant amount of a military-type explosive. These are not things that you just go down to the drugstore and buy a pound of, these are not things you buy innocuous materials and manufacture in your backyard.  PETN is manufactured in factories that have specialized tools and equipment and knowledge.

> I think that I will concur with Mr. Defenbaugh's conclusion that it is a state- or military-run factory that produces this type of materially, and I think the fact that it was carried out so successfully and not bungled really enhances the fact that somebody had practiced this before . . . .

> During the, say, late '60s, early '70s, clear up into the '80s, there were state-sponsored training camps involving the use of explosives for political gain, and these training camps used as part of their training, and I have seen materials seized from those that included pages from military manuals, U.S. military as well as English and French military manuals, as part of their training in calculating the explosive charges.

*Id.* at 57–58.  When asked if Iran ran these types of trainings, Parker confirmed that they did, often lasting three or four months.  *Id.* at 58.

From this evidence, the Court finds that Defendants ordered the attack on the Marine barracks in Beirut and supplied the explosive material used in the attack.  The Court also concludes that the suicide truck was assembled either with knowledge acquired by Iranian training or was assembled by Iranian agents themselves.  Iran was critical in developing the attack plan that was subsequently carried out at its behest.

### 5.  The Marines in Beirut were noncombatants acting in a peacekeeping capacity.

Battalion Landing Team 1/8, 24th Marine Amphibious Unit joined an international peacekeeping mission in Beirut in May 1983.  *Id.* at 49.  The 24th MAU was under strict rules of engagement.  *Id.*  Servicemembers were not allowed to carry weapons with live rounds chambered, nor were they allowed to chamber rounds unless either directed to do so by a commissioned officer or if they found themselves in a self-defense situation that immediately required the use of deadly force.  *Id.* & n.4.  The Marines were peacekeepers; they possessed neither combatant nor police powers.  *Id.*; *see also id.* at 50 n.5 (noting that the death certificates issued for victims of the October 23, 1983 attack did not represent that the victims were killed in action, but rather were killed in a "terrorist attack").

Colonel Timothy Geraghty, the commander of the 24th MAU, testified in *Peterson* that these restrictive rules "were geared primarily . . . with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally.  That could be a tinderbox.  That could start a whole chain of events."  *Id.* at 50.  "Col. Geraghty further testified that the location and security of the 24th MAU's position was not tactical in nature, and was only acceptable to the commanding officer in the context of the unit's mission to 'provide a presence.' "  *Id.*

11

The Court thus finds that the Marines on the ground in Beirut in the fall of 1983 were there in a purely peacekeeping capacity.  They were not active combatants.

**6.     Plaintiffs' connections to the bombing.**

Gregory Balzer was a young Lieutenant at the time of the bombing.  *See* Decl. of Gregory Balzer, ECF No. 14-1, ex. A, at 2.  He was sleeping at the Presidential Palace when the explosion woke him up.  *Id.* at 3.  Although it was three miles away, the explosion cracked the glass of the room in which he was sleeping.  *Id.*  Balzer helped with the rescue and recovery operation at the barracks.  *Id.*  He recovered the remains of approximately fifteen Marines and the partial remains of many more.  *Id.*  He personally knew each Marine whose body he recovered.  *Id.*  He later had to inventory the personal effects of every officer killed in the bombing.  *Id.*  And he had to identify the remains of several Marines.  *Id.*  He has since been diagnosed with PTSD from his experience with the bombing of the barracks and has suffered extreme physical and emotional distress from the incident.  *Id.* at 6.

Brian Bashore was a young Marine guarding the main gate to the Beirut barracks.  Decl. of Brian Bashore, ECF No. 14-1, ex. B, at 2.  When the bomb exploded, he was thrown to the ground and wounded by shrapnel.  *Id.*  He spent the next two days digging out the bodies of his fellow Marines.  *Id.*  He has suffered from continuous physical and emotional distress from the bombing. *Id.* at 3.  He has also been diagnosed with PTSD.  *Id.*

Joseph M. Cook was also a Marine deployed in Beirut at the time of the bombing.  Decl. of Joseph M. Cook, ECF No. 14-1, ex. E, at 1–2.  He almost slept at the barracks the night before the explosion; instead, he caught the last Jeep back to his position at the southern tip of the airport runway.  *Id.* at 2.  He worked recovering bodies for about two weeks.  *Id.* at 3.  The event severely damaged his psyche.  *See id.* at 2–3.  He has been diagnosed with PTSD from that day.  *Id.* at 4.  And he continues to suffer from physical and emotional distress.  *Id.*

Dan James, Jr., was a Marine stationed to the Communications Team in Beirut at the time of the attack. Decl. of Dan James, ECF No. 14-1, ex. I, at 1–2. He was a few hundred meters from the explosion and was thrown by the blast. *Id.* at 2. He saw body parts all around him and rushed to pull bodies out of the rubble. *Id.* He has suffered extreme physical and emotional distress because of the bombing. *Id.* at 3. He also has been diagnosed with PTSD. *Id.*

Thomas Quinn was a mortar specialist stationed in Beirut with the 1st Battalion, 8th Marines. Decl. of Thomas Quinn, ECF No. 14-1, ex. L, at 1. He was sleeping at the mortar pit when the explosion hit; it tossed him from his bed. *Id.* at 2. He tried to dig Marines out, but only found one man. *Id.* He saw another member of his platoon cut in half. *Id.* About half his battalion was killed in the attack, and he was initially listed as missing because his things were found in the barrack. *Id.* It took three days for him to contact his mother and let her know he was okay. *Id.* Quinn has suffered and continues to suffer from physical and emotional distress because of the bombing. *Id.* at 3. He has been diagnosed with PTSD. *Id.*

Harold Eugene Woodside wanted to follow his father and uncles' footsteps; all were in the military, so he joined the Marines. Decl. of Harold Woodside, ECF No. 14-1, ex. R, at 1. He was about two-hundred feet from the barracks when the explosion occurred; it threw him into the sandbag wall of a bunker, knocking him unconscious. *Id.* at 2. He later ran to the barracks, helping render first aid. *Id.* at 2–3. After a lifetime of struggles, he was diagnosed with a traumatic brain injury from the blast, PTSD, and post-traumatic major depressive disorder by the VA in 2015. *Id.* at 3. The VA awarded him a 100 percent total and permanent disability rating. *Id.* He has suffered from vivid nightmares, anxiety, depression, mood swings, uncontrollable anger, and suicidal thoughts since the attack. *Id.* at 4. And his relationship with his wife and children has suffered. *Id.*

Richard Zierhut, Jr. was a Lance Corporal in the Marines when the bombing took place. Decl. of Richard Zierhut, Jr., ECF No. 14-1, ex. U, at 1.  If he followed his normal morning routine, he would have been in the barracks at the time of the explosion.  *Id.* at 1–2.  But for some reason, he did not.  The blast blew him from his chair and into a wall; the door to his room was blown off and concrete was thrown everywhere.  *Id.* at 2.  Running towards the barracks, he saw bodies and body parts strewn across the ground and hanging from trees.  *Id.*  A mushroom cloud towered where the barracks used to be.  *Id.*  He worked on the recovery efforts for days.  *Id.* at 3.  He suffered permanent physical injuries, including hearing loss and scars from wounds, in addition to emotional injuries, including PTSD, that continues to affect him today.  *Id.*  He used to be very close to his family; after the bombing, he was not for many years.  *Id.*

Ter-ri Norene Jones and Pamela Elaine Davis are sisters of Scott Wayne.  Decl. of Ter-ri Norene Jones, ECF No. 14-1, ex. J, at 1; Decl. of Pamela Elaine Davis, ECF No. 14-1, ex. F, at 1. Wayne was deployed to Beirut and was on night patrol when the attack happened.  Decl. of Pamela Elaine Davis at 2.  But the sisters did not know this; news crews camped on their yard until they heard that Scott was okay, some two or three days after the attack.  *Id.*  The attack changed Scott's behavior dramatically.  *Id.*  He became angrier, turned to drugs, and stopped communicating with his family.  *Id.*  It took many years for him to begin communicating with his sisters again.  *Id.*; Decl. of Ter-ri Norene Jones at 2.  He has since been diagnosed with PTSD.  *Id.*; Decl. of Pamela Elaine Davis at 3.  Both sisters suffered from extreme emotional distress because of the bombing, and Jones continues to suffer from emotional pain, stress, and the lack of solatium.  *Id.*; Decl. of Ter-ri Norene Jones at 3.

Plaintiffs Irma Buck, Estela Cabus, Maria Encinas, and Susana Gomez are sisters of Luis Alonso.  Decl. of Irma Buck, ECF No. 14-1, ex. C, a 1; cl. of Estela Cabus, ECF No. 14-1, ex. D,

at 1; Decl. of Maria Encinas, ECF No. 14-1, ex. G, at 1; Decl. of Susana Gomez, ECF No. 14-1, ex. H, at 1. Eddie Nava is his biological nephew and brother through adoption. Decl. of Eddie Nava, ECF No. 14-1, ex. K, at 1. Judith Latios, Carlos Nava, and Daniel Nava were other siblings. Decl. of Maria Encinas at 1–3; Decl. of Erik Mata for the Estate of Georgina Ruela, ECF No. 14-1, ex. Q, at 1. And George Nava and Esperanza Nava were his parents. Decl. of Maria Encinas at 3. Irma, Estela, and Susana were close to Luis; they suffered extreme emotional distress upon learning of the bombing and Luis's death from it, and they continue to suffer from emotional pain, stress, and the loss of solatium from Luis Alonso's death. Decl. of Irma Buck at 2; Decl. of Estela Cabus at 2; Decl. of Susana Gomez at 1–2. Maria was Luis Alonso's primary caregiver for several years. Decl. of Maria Encinas at 1–2. She has suffered extreme emotional distress because of the bombing. *Id.* at 3. And she continues to suffer from emotional pain, stress, and the loss of solatium. *Id.* She also personally witnessed and attests that her parents, George and Esperanza, and her now-deceased siblings (Judith, Carlos, and Daniel), all suffered from extreme emotional distress, as well. *Id.* They suffered because of the emotional pain, stress, and loss of solatium inflicted upon them and their family as a result of the attack. *Id.*

Georgina Ruela was also very close with Luis Alonso; they lived together for several years while working. Decl. of Erik Mata for the Estate of Georgina Ruela at 1–2. She was devastated by the news of Luis's death. Erik Mata witnessed and attests to her deep sorrow and overwhelming grief following Luis's passing. *Id.* at 3. Ruela suffered extreme emotional distress because of the bombing. *Id.* The same is true for Eddie Nava; he was also deeply hurt by his adopted-brother's death. Decl. of Eddie Nava at 1. Luis was supposed to take Eddie in when he returned from the Marines; his death in the bombing made that impossible. *Id.* at 2. Eddie has suffered from extreme

emotional distress because of the bombing.  He suffered and continues to suffer because of the emotional pain, stress, and the loss of solatium inflicted upon him and his family because of it.  *Id.*

Anthony Rich, Melvin Rich, and Sharon Rich are all siblings of Steven Forrester.  Decl. of Anthony Rich, ECF No. 14-1, ex. M, at 1; Decl. of Melvin Rich, ECF No. 14-1, ex. N, at 1; Decl. of Sharon Rich, ECF No. 14-1, ex. O, at 1.  Stephanie Rich was his sister.  Decl. of Stephanie Rich, ECF No. 14-1, ex. P, at 1.  Each sibling suffered extreme emotional distress because of the bombing and their brother's death in it; they suffer from emotional pain, stress, and the loss of solatium.  Decl. of Anthony Rich at 2; Decl. of Melvin Rich at 2; Decl. of Sharon Rich at 2; Decl. of Stephanie Rich at 2.  Sharon details how the family was first told that Steve was missing, before being told that he was safe and found in a hospital, before being told that he had been killed.  Decl. of Sharon Rich at 2.  Stephanie Rich passed away during the pendency of this litigation.  *See* Mot. to Substitute Keith Dunkley, Jr., in his capacity as representative of the Estate of Stephanie Rich, ECF No. 19.  Her estate is represented by Keith Dunkley, Jr.  *See* Minute Order of December 13, 2021.

Mary Kathleen Zierhut is the younger sister of Richard Zierhut.  Decl. of Mary Kathleen Zierhut, ECF No. 14-1, ex. S, at 1.  Richard was in Beirut at the time of the attack.  *Id.* at 2.  It took him 48 hours to be able to call and tell his family he was alive, although his legs had been injured.  *Id.* at 2–3.  When Richard returned, he became more aggressive and angry, picking fights and hurting his sister.  *Id.* at 3.  She no longer has a relationship with him because of the man he has turned into.  *Id.*  She has suffered extreme emotional distress because of the bombing of the Marine barracks in Beirut.  *Id.*  She suffered and continues to suffer because of the emotional pain, stress, and the loss of solatium inflicted upon her and her family as a result of the attack.  *Id.*

Richard Ziehurt, Sr. is the father of Richard Zierhut, Jr.  Decl. of Richard Zierhut, Sr., ECF No. 14-1, ex. T, at 1.  He encouraged his son to join the military and took the whole family out to California to celebrate his son's graduation from basic training.  *Id.*  He believes the attack changed his son and impacted his life; it damaged their relationship for many years and left a void that could not be filled.  *Id.* at 2.  He has suffered and continues to suffer because of the emotional pain, stress, and the loss of solatium inflicted upon him and his family as a result of the attack.  *Id.*

Richard Zierhurt, Jr., also operates as the representative of the estate of his sister, Lisa Zierhut.  Decl. of Richard Zierhut, Jr. at 1.  He testifies that Lisa suffered emotional distress because of the Marine barracks bombing, including emotional pain, stress, and the loss of solatium. *Id.* at 4.

## III.   Conclusions of Law

Based on the above findings of fact, the Court makes the following conclusions of law:

### A.  Original jurisdiction

Under 28 U.S.C. § 1330, federal district courts have original jurisdiction over FSIA claims that are (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity under 28 U.S.C. §§ 1605, 1606, 1607, or any applicable international agreement.  28 U.S.C. § 1330(a).  The Court concludes that Plaintiffs have demonstrated that each element is satisfied here, and therefore that the Court has subject-matter jurisdiction.

First, Plaintiffs have not sought a jury trial.  *See generally* Compl.  Thus, their civil action is a "nonjury civil action."  28 U.S.C. § 1330(a).  Second, the suit is brought against Defendants in their capacity as legal persons; it is not brought against property.

As for the Defendants' status as foreign states, no doubt Defendant Iran is one.  As for MOIS, the FSIA's definition of "foreign state" includes "a political subdivision . . . or an agency

17

or instrumentality of a foreign state."[3]  28 U.S.C. § 1603(a).  "Applying this definition, courts in this jurisdiction have been directed to ask whether an entity 'is an integral part of a foreign state's political structure'; if so, that defendant is treated as a foreign state for FSIA purposes."  *Fain*, 856 F. Supp. 2d at 119 (quoting *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005)).  Based on the evidence presented in *Peterson* and the findings of fact above, the Court concludes that MOIS is an integral part of Iran's political structure; it "is a division of the state of Iran that acted as a conduit for the state's provision of funds to terrorist organizations, including Hezbollah."  *Id.*.  The Court therefore concludes that Defendant MOIS is a foreign state for FSIA purposes.  *See also id.* (finding MOIS to constitute a foreign state); *Valore*, 700 F. Supp. 2d at 65 (same); *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007) (same); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 63 (D.D.C. 2010) (same); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 393–94 (D.D.C. 2015) (same).

The final requirement is that the Defendants are not entitled to sovereign immunity.  The Court concludes that they are not, under the state-sponsored-terrorism exception.  That exception waives a foreign defendant's sovereign immunity so long as the suit seeks (1) "money damages," (2) "against a foreign state," for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Again, each element is met here.

First, Plaintiffs seek only monetary damages.  *See* Compl. at 16 ¶¶ (a)–(e).  Second, as discussed above, both Defendants are properly classified as a foreign state.  Third, the Amended

---

[3] An "agency or instrumentality of a foreign state" is subsequently defined to include, among others, any entity which is a separate legal person, corporate or otherwise, which is an organ of a foreign state, and which is neither a citizen of a State of the United States nor created under the laws of any third country.  *Id.* § 1603(b).

Complaint contains claims for wrongful death, intentional infliction of emotional distress, battery, and assault. *See* Compl. ¶¶ 59–76.  The first of these is an action for "death" under § 1605A(a)(1). And the others "are clearly actions for 'personal injury' under § 1605A(a)(1)." *Fain*, 856 F. Supp. 2d at 119.  Fourth, the evidence establishes that Iran, acting through MOIS, founded Hezbollah and played a crucial role in planning and executing the 1983 bombing. *See supra* at 9–12; *Fain*, 856 F. Supp. 2d at 119–20; *see also Roth*, 78 F. Supp. 3d at 394.  And finally, "the 1983 bombing constitutes an extrajudicial killing that occurred as a direct and proximate result of defendants' conduct in providing financial and military assistance to the attackers." *Fain*, 856 F. Supp. 2d at 120.

## B.      Statute of limitations

FSIA has a strict statute of limitations. *See* 28 U.S.C. § 1605A(b).  But despite the statute's admonition that the Court be satisfied that Plaintiffs are entitled to relief, the Court of Appeals has held that the Court cannot sua sponte consider a statute-of-limitations defense if defendants have not appeared.  *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019).  The Court therefore need not wade into the question whether this action was timely filed.

## C.      Liability

The Court turns next to liability.  FSIA creates a private right of action for victims of state-sponsored terrorism.  28 U.S.C. § 1605A(c).  The right of action requires a demonstration (1) that victim suffered "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act"; (2) that the act was committed, or the provision provided, by the foreign state or its agent; and that the act (3) "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages." *Fain*, 856 F. Supp. 2d at 121 (quoting 28 U.S.C. §§ 1605A(a)(1) &

(c)).  The third and fourth prongs require Plaintiffs to articulate a way to recover through the lens of civil-tort liability.  *Id.*

### 1.    The Marine barracks bombing was an act of extrajudicial killing.

Plaintiffs have established that both Defendants were responsible for the attack on the U.S. Marine barracks in Beirut in 1983.  "The evidence concerning the actions of defendants Iran and MOIS demonstrates that they are culpable both for the extrajudicial killing of U.S. citizens and for the provision of material support to the members of Hezbollah participating in the bombing, in satisfaction of the first element of liability under the federal cause of action."  *Id.*

In the context of FSIA, an "extrajudicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. § 1605A(h)(7); Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence from *Peterson* and as reflected above, *see supra* at 7–12, establishes that, before the attack, Iran issued orders through MOIS to the Iranian ambassador in Syria, instructing him to direct members of terrorist organizations to attack the American peacekeeping force in Lebanon.  "There is no evidence that this order was sanctioned by any judicial body, and that order to use force against members of an international peacekeeping force was in direct contravention of civil guarantees recognized as indispensable to all free and civilized peoples."  *Fain*, 856 F. Supp. 2d at 121.  The Court thus concludes that the bombing of the Marine barracks was an extrajudicial killing undertaken by members of Hezbollah acting as agents of Defendants.

### 2.    Defendants or their agents committed the act.

The Court also concludes that Defendants provided material support or resources for this act of extrajudicial killing.  FSIA defines "material support or resources" broadly:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications, equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).  Again, the evidence from *Peterson* and as summarized above shows that, prior to the bombing, Iran founded and supported Hezbollah.  Many experts explained that Hezbollah was composed of Iranian agents and received direct support from Iran and MOISE at this time.  "And more specifically, the evidence shows that the explosive materials used in the attack were of a type and grade that would only have been available to the perpetrators of the attack through direct cooperation of the Iranian government, and that these materials could only have been used as effectively as they were with military assistance and training, which was provided by MOIS."  *Fain*, 856 F. Supp. 2d at 122.  The Court thus concludes that Defendants provided material support for the Marine barracks bombing.

The evidence presented in *Peterson* thus establishes that Hezbollah was an agent of Iran at the time of the attack.  It also establishes that Hezbollah initiated the attack upon the direct orders of Iran and MOIS.  "Under such circumstances, defendants may be held vicariously liable for the extrajudicial killing perpetrated by the bombers."  *Id.*

### 3.    Defendants caused many of Plaintiffs' injuries.

"The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs to prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered."  *Id.* (quotations omitted).  But FSIA does not "authorize the federal courts to fashion a complete body of federal law."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).  "Based on the Circuit Court's guidance, District Courts in this jurisdiction 'rely on well-established principles of law, such as those found

Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to outline the boundaries of these theories of recovery." *Fain*, 856 F. Supp. 2d at 122 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).   The Plaintiffs lay out four possible bases for relief: wrongful death, intentional infliction of emotional distress, and assault and battery.  Compl. ¶¶ 59–76.

> a.    *Wrongful death.*

The Estate of Luis Nava brings a wrongful death action.  Compl. ¶¶ 59–62.  "A wrongful-death action is one brought by a decedent's heirs at law, and may be brought through the estate of the decedent, for economic losses which result from a decedent's premature death."  *Valore*, 700 F. Supp. 2d at 78.  Because the uncontroverted record evidence establishes that Defendants are liable for the death of Luis Nava, Defendants are also liable for the economic damages caused to the decedent's estate.  *See supra* at 14–16.

> b.    *Intentional infliction of emotional distress.*

Plaintiffs set forth three counts of intentional infliction of emotional distress.  *See* Compl. ¶¶ 65–66, 73–76.  Count Three is brought by Plaintiffs Irma Buck, Estela Cabus, Daniel Nava, Maria Encinas, George Nava, Esperanza Nava, Judith Latios, Susana Gomez, Eddie Nava, Anthony Rich, Melvin Rich, Sharon Rich, Stephanie Rich, and Georgina Ruelas.  *Id.* ¶ 65.  It alleges intentional infliction of emotional distress by immediate relatives of deceased victims.  *Id.* Count Six is brought by Plaintiffs Gregory Balzer, Harold Woodside, Thomas Quinn, Joseph M. Cook, Brian Bashore, and Dan James.  *Id.* ¶ 73.  It alleges intentional infliction of emotional distress by surviving victims.  *Id.*  And Count Seven is brought by Plaintiffs Lisa Zierhut, Mary

Kathleen Zierhut, Richard Zierhut, Sr., Pamela Elaine Davis, and Ter-ri Norene Jones.[4]  *Id.* ¶ 75.  It alleges intentional infliction of emotional distress by immediate relatives of surviving victims.  *Id.*

The allegations for each count are similar.  Each alleges that the attack caused the relevant Plaintiffs to suffer "extreme mental anguish," *id.* ¶¶ 65, 73, 75—allegations that, as discussed above, have been sworn to by each Plaintiff in their respective affidavits.  *See* supra at 12–17.  And each demands $20 million in compensatory damages from Defendants.  Compl. ¶¶ 66, 74, 76.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009).  Relying on the affidavits of the servicemember Plaintiffs, the Court concludes that they have made the requisite showing against Defendants for intentional infliction of emotional distress.  *See* supra at 12–17.

For family members not themselves the victim of the outrageous conduct, "[t]he scope of recovery under this theory is limited by two qualifications: the plaintiff must be 'a member of [the injured person's] immediate family' and must be 'present at the time.'"  *Fain*, 856 F. Supp. 2d at 123 (quoting Restatement (Second) of Torts § 46(2)(a)–(b)).  The first qualification is met here; every plaintiff is a sibling or parent of an injured serviceman.  *See supra* at 14–17.

Presence is trickier.  While the servicemember Plaintiffs were actually present in Beirut, their family members were not.  But courts in this District have "recognized that the presence requirement is subject to a caveat—specifically, the Restatement expresses no opinion as to

---

[4] The Amended Complaint spells Ms. Norene Jones's name as "Terri."  But she signed her affidavit as "Ter-ri."  *See* Decl. of Ter-ri Norene Jones.  The Court thus opts for the spelling favored by the affidavit.

whether there may not be other circumstances under which the actor may be subject to liability." *Fain*, 856 F. Supp. 2d at 123–24 (quotations omitted). Given the unique nature of terrorism, courts in this District have concluded that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family." *Heiser*, 659 F. Supp. 2d at 27. "Following this holding, the *Valore* Court determined that the Beirut bombing qualified as an extreme and outrageous act sufficient to invoke this theory of recovery for non-present plaintiffs, and the Court shall do the same here." *Fain*, 856 F. Supp. 2d at 124 (citation omitted).

The Court thus concludes that Defendants are liable for the mental anguish and suffering that all plaintiffs endured as a result of the attack on the Marine barracks.

### c.   Assault and battery.

Defendants are liable for assault if, when they committed the extrajudicial killing or provided material support and resources for the bombing, they acted "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). "It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear and further harm." *Fain*, 856 F. Supp. 2d at 122–23.

But Plaintiffs have not asserted in their declarations that they were put in imminent apprehension of harmful or offensive contact. Balzer, for instance, was three miles away from the explosion and sleeping. Balzer Decl. ¶ 10. Quinn was closer to the blast, but was also sleeping. Quinn Decl. ¶ 8. And while Woodside was awake, his back was turned to the explosion. Woodside Decl. ¶¶ 10–11. He testifies that he felt the explosion and that it tossed him into a wall, knocking him out. *Id.* But he never explains that he saw or heard the explosion coming, or that it put him in imminent apprehension of the offensive contact. Similarly, while Bashore states in his

declaration that the explosion—which occurred only 50 meters from him—tossed him a considerable distance and wounded him, he does not testify that the split second between the explosion and the contact put him in apprehension.  Bashore Decl. ¶ 9.  He thought the Marines were under attack from artillery, but that fear came to him *after* the explosion hit.  *Id.* ¶ 10.

The closest Plaintiffs to making out an assault claim are Cook and James.  Cook's affidavit explains that he "could hear the blast, felt the warm wave from the explosion, and saw the cloud rising from the other end of the runway."  Cook Decl. ¶ 11.  And he explains that, to this day, specific noises can set him off and make him feel as if he is back in Beirut.  *Id.* ¶ 23.  But he never testified that, when he felt and heard the explosion, he was put in imminent apprehension of offensive contact from the blast a mile away.

As for James, he was in a "communications van" a few hundred meters from the barracks.  James Decl. ¶ 9.  He explains that, just before he experienced the explosion, it felt like all the air was sucked out of the van.  *Id.*  Then everyone in the van "was thrown all over the place."  *Id.*  He thought that they had been hit by a mortar.  *Id.*  But again, while there is reason to assume that James would have been put in apprehension of some fear from the sudden air change, he never testifies that this was the case.

Thus, because no Plaintiff has provided evidence establishing that he was placed in immediate *apprehension* of harmful or offensive contact because of the conduct of Defendants, the Court cannot conclude that an assault took place.  But it might be that there are more facts might at play than are present in the current affidavits.  Perhaps Plaintiffs can tie the snipers in the hills to Defendants.  Or perhaps Plaintiffs did have an immediate apprehension of either the blast or a subsequent attempted contact by Defendants.  Accordingly, the Court will deny this claim without prejudice to the Plaintiffs proffering evidence that might establish such apprehension.

Yet all the present failures on assault are remedied with respect to Plaintiffs' battery claims. Defendants are liable for battery if, when they committed the extrajudicial killing or provided material support and resources for it, they acted "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results."  Restatement (Second) of Torts § 13.  "Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15.  "Again, it is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm."  *Fain*, 856 F. Supp. 2d at 123.  And accepting as true Plaintiffs' uncontroverted assertions that they did, in fact, suffer bodily harm from the blast, the Court concludes that Defendants are liable for battery.  *See* Balzer Decl. ¶¶ 10, 22, 24; Woodside Decl. ¶¶ 10–11; Quinn Decl. ¶¶ 8, 15; Cook Decl. ¶¶ 11, 23, 25; Bashore Decl. ¶¶ 9, 16; James Decl. ¶¶ 9, 16.  (The remaining Plaintiffs do not attempt to recover under this theory.  *See* Compl. ¶¶ 67–69.)

    d. *Survival action.*

  "A survival action is one that accrued in a decedent's favor before his death that may be brought after his death by his estate; in other words, it is a claim that could have been brought by the decedent, had he lived to bring it.  *Valore*, 700 F. Supp. 2d at 77.  The Estate of Luis Nava brings a survival claim, alleging that "from the time of his injury to his death[ ] thereafter, [he] suffered extreme bodily pain and suffering."  Compl. ¶ 63.  But the survival action never names what cause of action it pursues.  *Contra Valore*, 700 F. Supp. 2d at 77 (alleging pain and suffering stemming from assault, battery, and intentional infliction of emotional distress).  And even if it did, the Court has no evidence before it as to the circumstances of Nava's death.  Without that information, the Court cannot conclude that Nava can recover under this theory.  *See id.* (collecting

citations for the proposition that there can be no recovery for pain and suffering if death was instantaneous).  Accordingly, the Court will deny this claim without prejudice, allowing the Estate to supplement the pleadings to make up for these insufficiencies if it wishes.

      **4.**      **Plaintiffs have brought an action for personal injury.**

This fourth element is obviously met: as discussed immediately above, Plaintiffs have brought actions for personal injury or death by bringing claims for assault, battery, and intentional infliction of emotional distress.

      **5.**      **The Court has proper jurisdiction over this action.**

And this fifth element is also met:  The Court has also established that it has jurisdiction over this action.

\*     \*     \*

Plaintiffs moved for default judgment as to liability only.  *See* Mot.  The Court has concluded that liability has been established for many, but not all, claims.  Accordingly, the Court will grant the Motion in part and deny it in part.

An appropriate order will follow.

DATE:  February 28, 2022

CARL J. NICHOLS
United States District Judge